**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| Quince Imaging, Inc., ) <br> ) <br> *Plaintiff*, ) <br> ) <br> *v.* ) <br> ) <br> Ezetrick D. Coleman, ) <br> ) <br> *Defendant.* ) <br> ) | Civil Action No. _____ |

**VERIFIED COMPLAINT**

Plaintiff Quince Imaging, Inc. ("Quince"), through counsel, files this Verified Complaint against Defendant Ezetrick D. Coleman ("Coleman"). In support, Quince states as follows:

**PRELIMINARY STATEMENT**

1. In just over 2 years, Mr. Coleman embezzled over a half million dollars from Quince. Mr. Coleman carried out his scheme by using a company American Express credit card to purchase personal goods and services for his own personal use. Those purchases included thousands of dollars in everyday needs and luxuries, such as groceries, gas, dry cleaning, travel expenses, such as airline tickets and Uber and Lyft services, contractor, landscaping, and home improvement services, E-Z Pass charges, meals, liquor store charges, iTunes music, automobile repair services, dentist and medical expenses, Netflix, golf and recreational activities, and clothing.

2. In short, Mr. Coleman's scheme consisted of two overarching steps. First, Mr. Coleman used a Quince company American Express card, for which he was a named card-holder, to acquire various personal goods and services. Second, Mr. Coleman used and manipulated Quince's expense reimbursement and reporting system to misrepresent that the charges he incurred

were for legitimate company purposes. In turn, when presented with what appeared to be legitimate company expenses, Quince paid to American Express the amounts billed in connection with Mr. Coleman's use of that company credit card.

3. Mr. Coleman's scheme also consisted of creating sham trade names and entities, so that he could obtain additional goods and services.

4. Last, Mr. Coleman used Quince's Federal Express account for personal use and the shipment of goods and materials, as well as providing that account to his relatives and/or friends.

5. All told, the dollar amount that Quince has lost and paid, to date, resulting from Mr. Coleman's illicit acts is not less than $557,939.20.

## PARTIES

6. Plaintiff Quince is a corporation organized under the laws of the state of Texas, with its principal place of business now located at 22601 Davis Drive, Sterling, Virginia, and, during the relevant period, located at 2810 Towerview Road, Herndon, Virginia.

7. Defendant Coleman is an individual currently residing at 12903 Halls Purchase Lane, Bowie, Maryland 20721-3297, where he resided at all relevant times.

8. At all relevant times, Mr. Coleman held the title of "Information Systems & Technology Support Specialist" and "Information Technology Support Manager" with Quince and performed his job duties from Quince's offices, previously located in Herndon, Virginia.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because (i) the amount in controversy exceeds $75,000.00, excluding interest, costs, and fees; and (ii) the action is between citizens of different states.

10. The Court has personal jurisdiction over Mr. Coleman pursuant to Virginia Code § 8.01-328.1 because Mr. Coleman transacted business in the Commonwealth of Virginia, committed the acts complained of in the Commonwealth of Virginia, and caused injury to Quince in the Commonwealth of Virginia.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) because a substantial portion of the events and omissions giving rise to Quince's claims and causes of action occurred in this District and a substantial portion of the property subject to this action is located in this District.

## FACTS

**A. Background**

12. In 1997, Ron Currier and Scott Williams founded the predecessor to Quince, which provides innovative and experiential display and design services to a variety of entities, businesses, and clients.

13. Quince specializes in live event video production, creative content development, and permanent display system design and installation.

14. Quince's services include: (i) 3D animation and graphics support for Internet-based streaming and video services; (ii) production services for live events, such as conferences and galas; and (iii) specialty production services for sporting events at stadiums and arenas.

15. Today, Quince remains a privately held company with approximately 48

employees, the majority of which are based in northern Virginia.

16. On or about May 21, 2015, Quince extended an offer of at-will employment to Mr. Coleman for the position of "Information Systems & Technology Support Specialist," which Mr. Coleman accepted.

17. On or about May 28, 2015, Mr. Coleman began his employment with Quince.

18. In his early tenure with Quince, Mr. Coleman received positive reviews.

19. Mr. Coleman's work at Quince helped enhance and improve Quince's operating system and information technology platform, while also reducing costs and expenses for Quince.

20. As a result, in early June 2016, Mr. Coleman received a promotion to "Information Technology Support Manager," which also included an increased salary.

21. On August 16, 2016, Mr. Coleman executed an acknowledgement of the Quince employee handbook (the "Handbook Acknowledgment").  (**Exhibit 1**, attached hereto.)

22. The Quince employee handbook (the "Handbook") provides the terms and policies that govern Quince's employees' conduct.  (**Exhibit 2**, attached hereto, includes relevant excerpts of the 2017 Quince Handbook.)

23. The Handbook Acknowledgement provides that Mr. Coleman has "read and agree[s] with the company policies set forth in [the] Employee Handbook." (**Ex. 1**, at 1.)

24. The Handbook Acknowledgment provides that it is to be returned to Quince's human resources department "upon the complete review and understanding of [the] Employee Handbook." (**Ex. 1**, at 1.)

25. Further, the Handbook Acknowledgement provides that "[b]y signing and returning this page, you agree to abide by the contents of this Employee Handbook during your employment period." (**Ex. 1**, at 1.)

26. Among the Handbook's terms, "theft or dishonesty" may result in disciplinary action. (**Ex. 2**, at 7.)

27. The Handbook also covers the reimbursement to "employees for reasonable expenses incurred through pre-approved business travel or entertainment." (**Ex. 2**, at 9.)

28. For Quince employees that hold company credit cards, Quince validated the reimbursement and payment of credit card charges through an electronic system known as the "CONCUR Expense System". (**Ex. 2**, at 9.)

**B. The CONCUR Expense Reimbursement System**

29. CONCUR is a third-party program and system that enables companies to utilize its software for the paperless submission and approval of expense reports.

30. The Handbook states: "All business expenses and any charges made to the company credit cards are due into the CONCUR Expense system for manager approval by the 15th of the month, following the travel-month end." (**Ex. 2**, at 9.)

31. By example only, a Quince employee that held a company credit card in his own name was required to log into the CONCUR system after incurring charges that would be billed to and paid by Quince.

32. Each Quince employee that received a company credit card and account was issued a unique log-in and password to access and use the CONCUR expense reimbursement system.

33. The CONCUR expense reimbursement system interfaced directly with the credit card account, such that charges and purchases made with the Quince company credit card would be uploaded to Quince's CONCUR expense reimbursement system.

34. After a charge or purchase with a Quince company credit card, the CONCUR expense reimbursement system would obtain the basic data concerning a charge, including dollar

amount, date, and the identity of the third-party vendor, seller, or supplier.

35. In addition to the data transmitted to the CONCUR expense reimbursement system by the credit card company, CONCUR's software allowed for the employee to review each particular charge and enter additional data regarding the nature of a charge or purchase, including a further description of that charge or expense and whether or not the charge or expense was for an authorized Quince company purpose.

36. On a monthly basis, Quince employees were required to validate the charges and expenses incurred on a company credit card by logging into CONCUR and adding data and information

37. Thereafter, CONCUR generated a summary expense report that an employee described and validated as legitimate and eligible Quince company expenses.

38. Based on that summary report, Quince would review and process those expenses by remitting payment to the credit card company, such as American Express, for those charges and purchases that the employee represented as legitimate Quince company costs and eligible for reimbursement.

**B. Coleman's Fraudulent Use Of His Quince Company Credit Card**

39. During June 2015, Quince issued to Mr. Coleman a company American Express corporate credit card and account, with Mr. Coleman's name on that card and with a number ending in 2295 (the "Company Card").

40. While the Company Card included Mr. Coleman's name on that card, Quince was also a co-account holder for the Company Card.

41. Accordingly, Quince was liable at all times to American Express for charges incurred on that Company Card.

42. As detailed below, Mr. Coleman used the Company Card for numerous purchases and charges for solely personal purposes and without any authorization from Quince.

43. In 2016, the aggregate total of Mr. Coleman's illicit and unauthorized charges to the Company Card was not less than $41,288.97 (collectively, the "2016 Charges"). (**Exhibit 3**, attached hereto, details the 2016 Charges.)

44. Mr. Coleman used the CONCUR system to represent that the 2016 Charges were for legitimate Quince company purposes, causing Quince to remit payment to American Express in the amount of the 2016 Charges.

45. In 2017, the aggregate total of Mr. Coleman's illicit and unauthorized charges to the Company Card was not less than $226,044.07 (collectively, the "2017 Charges"). (**Exhibit 4**, attached hereto, details the 2017 Charges.)

46. Mr. Coleman used the CONCUR system to represent that the 2017 Charges were for legitimate Quince company purposes, causing Quince to remit payment to American Express in the amount of the 2017 Charges.

47. In 2018, the aggregate total of Mr. Coleman's illicit and unauthorized charges to the Company Card was not less than $287,495.61 (collectively, the "2018 Charges"). (**Exhibit 5**, attached hereto, details the 2018 Charges; collectively, the 2016, 2017, and 2018 Charges are the "Unauthorized Coleman Charges".)

48. Mr. Coleman used the CONCUR system to represent that the 2018 Charges were for legitimate Quince company purposes, causing Quince to remit payment to American Express in the amount of the 2018 Charges.

   1. **Commercial Network Systems**

49. On information and belief, Mr. Coleman transacted business as, or traded business

through, a purported entity with the name of Commercial Network Systems.

50. On information and belief, Commercial Network Systems was not registered with the Maryland Secretary of State or otherwise organized under the laws of any other jurisdiction.

51. At all relevant times, Commercial Network Systems operated with a mailing and business address of 12903 Halls Purchase Lane, Bowie, Maryland 20721-3297.

52. At all relevant times, Mr. Coleman resided at, and continues to reside at, 12903 Halls Purchase lane, Bowie, Maryland 20721-3297.

53. Between May 2018 and November 2018, Mr. Coleman used his Company Card to to transfer funds to Commercial Network Systems in an amount not less than $22,222.00. (**Exhibit 6**, attached hereto, details the Commercial Network Systems charges.)

54. The funds transferred to Commercial Network Systems were then transferred to Mr. Coleman through his use of the Squareup.com credit card processing system.

55. On information and belief, Commercial Network Systems was a fictitious name or sham entity utilized by Mr. Coleman to obtain funds from Quince.

56. Quince did not authorize Mr. Coleman, on behalf of Quince, to use the Company Card to transact business with Commercial Network Systems.

57. The goods and services for which Mr. Coleman utilized the Company Card to transact with Commercial Network Systems were acquired by Mr. Coleman solely for his personal use and not for any purpose on behalf of Quince.

**2. Guzman Contractor LLC**

58. Between October 2017 and November 2018, Mr. Coleman used his Company Card to purchase goods and services from an entity known as Guzman Contractor LLC in an amount not less than $31,468.72. (**Exhibit 7**, attached hereto, details the Guzman Contractor LLC

charges.)

59. Quince did not authorize Mr. Coleman, on behalf of Quince, to use the Company Card to transact business with Guzman Contractor LLC.

60. The goods and services for which Mr. Coleman utilized the Company Card to transact with Guzman Contractor LLC were acquired by Mr. Coleman solely for his personal use and not for any purpose on behalf of Quince.

### 3. JR Data Solutions LLC

61. On information and belief, on or about August 2, 2016, Mr. Coleman organized an entity known as JR Data Solutions LLC as a limited liability company and registered that entity with the Virginia State Corporation Commission. (**Exhibit 8**, attached hereto, is a true and accurate copy of details from the Virginia State Corporation Commission as to JR Data Solutions.)

62. On November 30, 2018, the Virginia State Corporation Commission cancelled, or otherwise terminated, JR Data Solutions LLC.

63. According to the Virginia State Corporation Commission, JR Data Solutions LLC had its principal address at 8807 Bentfield Drive, Manassas, Virginia 20110.

64. According to the Virginia State Corporation Commission, JR Data Solutions LLC's registered agent was Isaiah Donaldson, Jr. ("Donaldson").

65. At all relevant times, Mr. Donaldson was, and remains, an employee of Quince, performing IT and quality control related services.

66. Mr. Donaldson's nickname among Quince employees is "J.R.".

67. 8807 Bentfield Drive, Manassas, Virginia 20110, the principal address of JR Data Solutions LLC, is residential property owned by Mr. Donaldson's parents, Isaiah Donaldson, Sr. and Tamika Donaldson.

68. At all relevant times, Mr. Donaldson resided at 8807 Bentfield Drive, Manassas, Virginia 20110.

69. Between May 2017 and May 2018, Mr. Coleman used his Company Card to purchase goods and services from JR Data Solutions LLC in an amount not less than $33,854.84. (**Exhibit 9**, attached hereto, details the JR Data Solutions LLC charges.)

70. On information and belief, JR Data Solutions LLC was a sham entity utilized by Mr. Coleman to obtain funds and property by transferring those costs to Quince.

71. Quince did not authorize Mr. Coleman, on behalf of Quince, to use the Company Card to transact business with JR Data Solutions LLC.

72. The goods and services for which Mr. Coleman utilized the Company Card to transact with JR Data Solutions LLC were acquired by Mr. Coleman solely for his personal use and not for any purpose on behalf of Quince.

**4. Amazon Charges**

73. Beginning in September 2016 and continuing through November 2018, Mr. Coleman used the Company Card for personal charges, without authorization from Quince, to acquire various goods from Amazon and related entities.

74. Between September 2016 and November 2018, Mr. Coleman used the Company Card to make purchases with Amazon Digital Services, Amazon Marketplace, Amazon.com, Amazon Fresh, and other Amazon-related entities.

75. Between September 2016 and December 2016, Mr. Coleman used the Company Card approximately 67 times for unauthorized personal purchases from Amazon-related entities (the "2016 Amazon Charges").

76. The dollar amount of the 2016 Amazon Charges for which Mr. Coleman used the

Company Card is approximately $13,701.14.

77. In 2017, Mr. Coleman used the Company Card approximately 389 times for unauthorized personal purchases from Amazon-related entities (the "2017 Amazon Charges").

78. The dollar amount of the 2017 Amazon Charges for which Mr. Coleman used the Company Card is approximately $71,630.23.

79. Between January 2018 and November 2018, Mr. Coleman used the Company Card approximately 294 times for unauthorized personal purchases from Amazon-related entities (the "2018 Amazon Charges").

80. The dollar amount of the 2018 Amazon Charges for which Mr. Coleman used the Company Card is approximately $47,974.62.

81. In total, between September 2016 and November 2018, the dollar amount of unauthorized charges for which Mr. Coleman used the Company Card to acquire goods from Amazon-related entities is approximately $133,305.99. (**Exhibit 10**, attached hereto, details the 2016, 2017, and 2018 Amazon Charges.)

82. Based on his unauthorized use of the Company Card, by letter dated November 27, 2018, Quince terminated Mr. Coleman's at-will employment with Quince.

**5. Federal Express Charges**

83. In addition to the Company Card, Mr. Coleman also received access and authorization to use Quince's Federal Express account to ship goods and materials for Quince company purposes.

84. The Quince Federal Express account ended with the numbers 0137-3.

85. On information and belief, Mr. Coleman has used the Quince Federal Express account to charge Quince for the shipment of goods and other materials solely for personal use.

86. On information and belief, Mr. Coleman has disseminated the Quince Federal Express account number to relatives and/or personal friends for their use, with no authorization from Quince.

87. Mr. Coleman's unauthorized use of the Quince Federal Express account number began during May 2017, and his use of that account—as well as the use of that account by his friends and/or relatives—has continued through May 2019.

88. The aggregate dollar amount of invoices to Quince from Federal Express for the unauthorized use of the Quince Federal Express account number by Mr. Coleman, and his friends and/or relatives, is not less than $3,110.50.  (**Exhibit 11**, attached hereto, details these Federal Express charges.)

**C. The CONCUR System And Mr. Coleman's Expense Reimbursement Reports**

89. As stated above, Quince relied on employees, such as Mr. Coleman, to substantiate and validate that expenses incurred on company credit cards were for authorized company purposes in order for Quince to process payment to the credit card company.

90. Mr. Coleman received a unique and personal CONCUR log-in and password in order to process charges that made to his Company Card.

91. In addition to his unique and personal CONCUR log-in and password, Mr. Coleman—by nature of his professional duties and title with Quince—was granted authorization and access to the CONCUR expense reimbursement system as an administrator.

92. Mr. Coleman's administrative access to the CONCUR system was a level of access greater than the access afforded to non-administrative employees.

93. As to each of the Unauthorized Coleman Charges for which Mr. Coleman acquired goods or services through the Company Card, Mr. Coleman completed an entry with the CONCUR

system, which entries included statements by Mr. Coleman that the goods or services acquired were for Quince company purposes.

94. Mr. Coleman utilized Quince computers and software licensed to Quince to log into and complete expense reports with the CONCUR system.

95. Through his statements and representations with the CONCUR system for expense processing, Mr. Coleman represented that each of the Unauthorized Coleman Charges was incurred for a legitimate Quince company purpose.

96. Accordingly, Quince relied on expense reports generated by the CONCUR system—based on Mr. Coleman's entries—that the Unauthorized Coleman Charges were in furtherance of legitimate Quince business tasks, purposes, and goals.

97. Further, Mr. Coleman utilized his position and knowledge of Quince's IT systems to manipulate the back-up data contained in his entries with the CONCUR system.

98. In certain instances, Mr. Coleman used his administrative access to delete master files and back-up data that included details with respect to the Unauthorized Coleman Charges for which he intended Quince to pay the charges associated with Mr. Coleman's purchase of personal goods and services.

99. Mr. Coleman's manipulation, deletion, and omission of data and details concerning his entries with the CONCUR system concealed the nature of the Unauthorized Coleman Charges.

100. Due to the statements and entries made by Mr. Coleman with the CONCUR system—including Mr. Coleman's manipulation of certain entries and data—Quince timely processed and paid to American Express the amounts incurred on the Company Card for the Unauthorized Coleman Charges.

## CAUSES OF ACTION

### COUNT I - CONVERSION

101. Plaintiff Quince incorporates by reference, as though fully restated herein, each of the allegations stated at paragraphs 1 through 100, above.

102. Mr. Coleman exercised improper and unauthorized ownership, dominion, and control over Quince's property, by the series of unlawful acts and omissions described in this Complaint, including, without limitation, Mr. Coleman's misuse of Quince's Federal Express account, misuse of the Company Card, and the improper reimbursement requests entered through the CONCUR system.

103. Mr. Coleman's conversion of Quince's property, including, Quince's funds, was the direct and proximate cause of damages to, and harm sustained by, Quince.

### COUNT II - FRAUD

104. Plaintiff Quince incorporates by reference, as though fully restated herein, each of the allegations stated at paragraphs 1 through 100, above.

105. Mr. Coleman made numerous material, false representations to Quince, on which Quince relied, including, without limitation, (i) Mr. Coleman's requests for reimbursement of expenses through the CONCUR system under the guise that those expenses were incurred by Mr. Coleman in furtherance of and for company purposes; (ii) Mr. Coleman's manipulation of the data contained in the CONCUR system and the reports generated by the CONCUR system; (iii) Mr. Coleman's misuse of the Company Card; and (iv) Mr. Coleman's misuse of Quince's Federal Express account.

106. Each of these misrepresentations were of a material fact, and each misrepresentation was of such significance that, had Quince known the actual and true purposes

of the expenses for which Mr. Coleman sought reimbursement, Quince would not have reimbursed and paid funds to Mr. Coleman or paid funds to American Express in satisfaction of the Unauthorized Coleman Charges.

107. Mr. Coleman made these representations intentionally and knowingly.

108. Mr. Coleman made these representations with the intent to mislead Quince.

109. Quince reasonably relied on Mr. Coleman's material misrepresentations and omissions.

110. Mr. Coleman's material misrepresentations and omissions were the direct and proximate cause of damages to, and harm sustained by, Quince.

### COUNT III – UNJUST ENRICHMENT

111. Plaintiff Quince incorporates by reference, as though fully restated herein, each of the allegations stated at paragraphs 1 through 110, above.

112. Mr. Coleman has derived benefits, including improper financial gain, from his willful and improper use of his Quince company credit card.

113. Mr. Coleman knew and was aware that he derived benefits, including improper financial gain, from his willful and improper use of his Quince company credit card.

114. Mr. Coleman has accepted and retained the benefits, including improper financial gain, from his willful and improper use of his Quince Company Card, the CONCUR system, and the Quince Federal Express account.

115. Mr. Coleman's retention of those benefits is inequitable without paying or compensating Quince for the value and cost of those benefits.

### COUNT IV – VIOLATION OF VA. COMPUTER CRIMES ACT
### (VA. CODE §§ 18.2-152.3 – 18.2-152.15)

116. Plaintiff Quince incorporates by reference, as though fully restated herein, each of

the allegations stated at paragraphs 1 through 115, above.

117. Mr. Coleman used a Quince computer and the Quince computer network without, and in excess of his, authority to obtain property through false pretenses.

118. Mr. Coleman used a Quince computer and the Quince computer network without, and in excess of his, authority to embezzle funds from Quince.

119. Mr. Coleman used a Quince computer and the Quince computer network without, and in excess of his, authority to convert the property of Quince.

## RESERVATION OF RIGHTS

120. Quince reserves all rights, claims, and defenses as to Mr. Coleman, and any other entities, persons, or individuals, in connection with the facts and allegations in this Complaint. Nothing herein shall be construed as a waiver of, or otherwise prejudice, Quince's rights, claims, and defenses as to Mr. Coleman and any other entities, persons, or individuals, including, without limitation, to amend this Complaint based on any additional facts that may become known after the filing of this Complaint.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Quince requests that the Court award and enter judgment for such damages, as may be proved at trial, including, without limitation, the following:

a. An amount to be proven at trial, but not less than $557,939.20;

b. Prejudgment and postjudgment interest;

c. The costs, expenses, and fees incurred by Quince in pursuing this action, including, without limitation, reasonable attorneys' fees and costs, which are not less than $6,177.75 as of June 20, 2019; and

d. Such further relief that the Court deems proper.

DATED: June 25, 2019                    QUINCE IMAGING, INC.

/s/ James Donaldson
James K. Donaldson, Esq. (VSB No. 80307)
Andrew P. Selman, Esq. (VSB No. 91060)
Vandeventer Black LLP
Riverfront Plaza – West Tower
901 East Byrd Street, Suite 1600
Richmond, VA 23219
(804) 237-8800 (telephone)
(804) 237-8801 (facsimile)
jdonaldson@vanblacklaw.com
aselman@vanblacklaw.com
*Counsel for Quince Imaging, Inc.*